Public Service Commission, } No. 3965.
    Oct. 3, 1950. }

PETITION OF PUBLIC SERVICE COMPANY OF N. H.

*Thornton Lorimer* and *Francis E. Perkins* (*Mr. Lorimer* orally), for the State of New Hampshire.

*Sulloway, Piper, Jones, Hollis & Godfrey* (*Mr. Hollis* orally), for the Public Service Company of N. H.

*Eugene S. Daniell* (by brief and orally), for the City of Franklin.

*Harry Carlson* (orally), for the Sullivan County Democratic Committee.

*Robert P. Bingham* (orally), *pro se.*

*Tobey & Zellers* for the New Hampshire Electric Cooperative, Inc. and White Mountain Power Company (filed no brief).

BLANDIN, J. The question before us is whether on the facts stated the General Electric Company is an affiliate of the Public Service Company of New Hampshire (hereinafter called the company) within the meaning of R. L., c. 305, s. 1, par. II(a) which reads as follows:

"'Affiliate'° shall mean and include the following: (a) Every person owning or holding "directly or indirectly" twenty per cent or more of the voting capital stock of a public utility." Considering the wording and history of the law we believe our answer must be that it is not. According to the record the General Electric never owned any stock in the company and neither now or at any time since it purchased stock in the New England Public Service Company has it owned or held directly or indirectly a majority interest in the New England Public Service Company. Under the circumstances we believe by no stretch of language can it be said that the General Electric "owns," or since 1933 has owned "directly or indirectly" twenty per cent of the voting capital stock of the company so as to become an affiliate of it. The case of *Attorney General* v. *New York, New Haven & Hartford Railroad*, 198 Mass. 413, cited by State's counsel as authority for his position is clearly distinguishable from the situation before us and furnishes no authority here. There the corporation charged with "directly or indirectly" subscribing for, or, taking or holding the stock of other railroad corporations held complete control over and owned all the stock of another corporation which in turn bought and held railroad stocks.

Nor do we believe it can be said that the General Electric "holds" or since 1933 has held directly or indirectly twenty per cent or more of the voting capital stock of the company. Counsel has cited no authority, nor do we know of any which would so interpret the words under the circumstances here. No claim is made that there is or has been within the period under consideration any direct holding of the voting capital stock of the company by the General Electric. If it may be said that language in *State* v. *New Hampshire Gas and Electric Co.*, 86 N. H. 16, lends support to the argument that the General Electric is an affiliate of the company, holding indirectly twenty per cent of the company's voting capital stock, we believe that case is no authority here. The Public Service Commission there found that the two New Hampshire utilities, which seem to have been considered by our court on the strength of this finding as affiliates of the Associated Gas & Electric Company, were controlled and operated by the Associated company through controlling interests in a chain of stock ownership and interlocking directorates. There is no such evidence before us of control of the Public Service Company of New Hampshire by the General Electric. Furthermore that case was decided in 1932 prior to the enactment of our present law and the Legislature's rejection of the chain ownership principle set forth in House Bill 358 as

hereinafter discussed. Construing the language according to "common and approved usage," in the absence of any showing that it is such technical language as has acquired "familiar" and "appropriate" meaning in law, as directed by R. L., c. 7, s. 2, the word "hold" means "to retain in one's keeping; to maintain possession of, or authority over . . . ." Webster's International Dictionary (2d ed.) 1187. See also, 40 C. J. S. 406, 407. Since it does not appear that the General Electric controls the New England company and it owns no stock in the Public Service Company of New Hampshire, it cannot be said to retain in its keeping or to maintain possession of, or authority over, twenty per cent of the voting capital stock of the New Hampshire company.

However, it is not necessary to rely wholly on these reasons because it seems the history of the act directly refutes such a meaning as the State contends for here. The first bill relating to this subject introduced in the House in 1933 (House Bill 358) so far as material defined affiliate as follows: "(a) Every person owning or holding directly or indirectly five per centum or more of the voting capital stock of a public utility.

"(b) Every person *in any chain* of successive ownership of five per centum or more of voting capital stock of a public utility.

"(c) Every corporation or association five per centum or more of whose voting capital stock, or certificates of membership, is owned by any person owning five per centum or more of the voting capital stock of a public utility or by any person *in any such* chain of successive ownership of five per centum or more of the voting capital stock of a public utility." (Emphasis ours).

Another bill (House Bill 458) which was referred to the House committee on judiciary defined affiliate thus; "II. 'Affiliate' shall mean and include the following:

"(a) Every person owning or holding directly or indirectly five per cent or more of the voting capital stock of a public utility.

"(b) Every corporation or association which has one or more officers or directors in common with a public utility.

"(c) Every person who the commission may determine as a matter of fact after investigation and hearing is either *directly* or *indirectly actually exercising any substantial influence over the policies and actions* of a public utility, whether or not in conjunction with one or more persons." (Emphasis ours).

It is obvious from these bills that the Legislature had in mind just such a situation as confronts us here and knew how to take care of it

had they so desired. It is equally plain that they considered the words "owning or holding directly or indirectly" used in both these bills inadequate for that purpose because they added to both House Bills 358 and 458 sub-sections (b) and (c). However, neither of these bills passed. House Bill 358 was reported by the committee on judiciary on May 11, 1933 "inexpedient to legislate, subject matter covered by another Bill," which report was promptly accepted. The same day the House passed House Bill 458 but the Senate amended it by striking it out in entirety and substituted the bill which later was enacted in its present form. On June 13 the Senate asked concurrence of the House. The House voted not to concur and asked for a committee of conference which on June 16 reported that the House ought to recede from its position and concur with the Senate amendment. After discussion the House accepted the report of the committee of conference and the bill, which counsel for the State candidly and we believe correctly admits was a compromise, became law. If, as suggested in argument the purpose of the Legislature was to guarantee "arm's-length" bargaining between corporations under the circumstances here no reason appears why it did not say so.

Other states prior to the passage of our statute enacted laws which contained provisions similar either to House Bill 358 (see General Acts, Alabama, Extra Session, 1932, c. 232) or combined the features of both House Bill 358 and House Bill 458, going even further in some respects. See Laws New York (1930) c. 760; Laws Kan. (1931) c. 239, s. 1; Laws Wis. (1931) c. 183, s. 196.52. The New York law for example defined "affiliated interests" in part as follows: "Section 2b. Every corporation and person in any chain of successive ownership of ten per centum or more of voting capital stock. c. Every corporation ten per centum or more of whose voting capital stock is owned by any person or corporation owning ten per centum or more of the voting capital stock of such utility corporation or by any person or corporation in any such chain of successive ownership of ten per centum or more of voting capital stock. . . . f.Every corporation or person which the commission may determine as a matter of fact after investigation and hearing is actually exercising any substantial influence over the policies and actions of such utility corporation even though such influence is not based upon stockholding, stockholders, directors or officers to the extent specified in this section."

Sub-section "g" provided in substance for an extension of "f" to include persons or corporations acting in conjunction with persons or corporations situated as thus described in "f." This applies though

their relationship to the matter may be only that of blood or ownership or by "action in concert" with other persons or corporations deemed to be affiliates.

The Congress of the United States faced with a like problem also found a plain solution. It wrote a law defining an affiliate among other things as follows: "Any person that directly or indirectly owns, controls, or holds with power to vote, 5 per centum or more of the outstanding voting securities . . . " Public Utility Holding Company Act of 1935 (s. 79), 15 U. S. C. A. 593.

Evidently Congress too considered this definition too narrow, though it is broader than ours, as will be noted by the insertion of the word "control" because they tacked on an addition, "any person or class of persons that the Commission determines, after appropriate notice and opportunity for hearing, *to stand in such relation* to such specified company *that there is liable to be such an absence of arm's-length* bargaining in transactions between them as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that such person be subject to the obligations, duties, and liabilities imposed in this chapter upon affiliates of a company." *Ib.*, (a) (11) (D). (Emphasis ours).

In brief our Legislature had ample opportunity to pass a statute expressly dealing with chain ownership as did other States and Congress. It rejected this solution after what appears to have been long and careful consideration and chose to enact a compromise. One result of the compromise was that the Legislature made ownership of voting stock the test to determine whether an utility should be regulated. In the sub-section before us it flatly rejected the test of control regardless of voting stock ownership. The conclusion appears inescapable that by this compromise it neither intended nor defined a corporation in the situation of the General Electric here, to be an affiliate of the New Hampshire company. The sound principle that the court's interpretation of such statutes as this should be liberal (*Railroad* v. *Railroads*, 65 N. H. 393, 399) and the argument that our construction should be as broad as the evil sought to be prevented (see *Opinion of the Justices*, 66 N. H. 629, 660) do not permit us to distort the words which the Legislature used nor to read in words which they refused to put there. *Manock* v. *Company*, 86 N. H. 104, 107; *Davis* v. *Company*, 88 N. H. 204, 207; *Bodeau* v. *Bodeau*, 92 N. H. 183, 184.

Our conclusion, therefore, is that the General Electric Company is not and has not been within the period involved an affiliate of the

Public Service Company of New Hampshire and the order is

*Case discharged.*

JOHNSTON, C. J. did not sit: the others concurred.